**Theresa C. ATKINSON, Appellant,**

v.

**Lewis K. ATKINSON, Appellee.**

No. 97–FM–1191.

District of Columbia Court of Appeals.

Argued April 15, 1999.
Decided June 10, 1999.

Marjorie Just, Washington, DC, for appellant.

Barbara E. Nicastro, Arlington, VA, with whom John F. Mercer and Roderic L. Woodson, were on the brief, for appellee.

Meredith Fuchs, with whom Laura A. Foggan, Washington, DC, was on the brief, for amici curiae Ayuda, Inc., and District of Columbia Coalition Against Domestic Violence.

Before TERRY and FARRELL, Associate Judges, and KERN, Senior Judge.

KERN, Senior Judge:

The parties to this appeal were married in September 1971, and appellant wife left the marital abode in October 1997. She filed a complaint for spousal support in December 1997, pursuant to D.C.Code § 16–916(a) (1997), which provides in pertinent part that "[w]henever a husband ... shall fail or refuse to maintain his ...

needy spouse, ... although able to do so, the court, upon proper application and upon a showing of genuine need of a spouse, may decree, pendente lite and permanently, that such husband ... shall pay reasonable sums periodically for the support of such needy spouse ... [and] suit money, including counsel fees, pendente lite and permanently, to enable plaintiff to conduct the case."

The trial court, after hearing testimony from appellant wife and other witnesses (but not appellee husband who chose not to testify) and considering various financial statements and other documents, *denied* appellant wife "spousal support and maintenance" from appellee husband, and determined that each party "shall ... be responsible for his or her own attorney's fees." We reverse.

The conscientious trial court, in the Conclusions of Law contained in its Judgment, cited *Tibbs v. Tibbs*, 223 A.2d 279, 279 (D.C.1966) for the "primary factors" that it must consider in determining whether to award maintenance to the wife and the amount of any such award.

These primary factors are:
- the duration of the marriage,
- the ages and the health of the parties,
- the wife's contributions to family support and property ownership,
- the needs of the wife and the husband's ability to contribute thereto, and
- the interest of society generally in preventing the wife from becoming a public charge.

*Id.*

The record concerning such factors is:

that 26 years had elapsed between the marriage and the separation, during which time the trial court found appellant wife "was a good and dutiful wife ... faithful in her marital duties";

that appellant wife (who had not been previously married) was 48 and appellee husband (who had a prior marriage and five grown children) was 72;

that appellant wife at the time of the separation suffered from allergies that contact with certain fabrics exacerbated and was seeing a psychotherapist for emotional distress, and appellee husband was suffering from ulcerated colitis caused by undue tension;

that the parties' marital home was valued at more than half a million dollars, they had three vehicles—two Rolls–Royce autos and an Isuzu Trooper truck—and owned and operated as partners a clothing boutique-type shop in Georgetown;[1]

that appellant wife had a Bachelor's Degree (having majored in Dance and Spanish) and had sewing skills which she used in the operation of the parties' shop, and appellee husband was a successful practicing physician;

that appellant wife had over the years of the marriage maintained the marital home for the use and enjoyment of the parties, had served as a hostess on all social occasions, had worked at appellee husband's medical office, and was working at their clothing shop doing fine seamstress work at the time of the separation;

that after appellant wife left the marital home she rented a room in a private home, paying $750 rent each month, and attempted to continue to work at the boutique, but this engendered disputes between the parties that caused her to stop working at the shop;

that appellee husband in the early months of their separation paid her $1000 a month but then reduced his payment to $500;

that appellee husband received in 1997 from a so-called pension trust fund aris-

---

1. The parties ultimately dissolved their business partnership, which their accountant testified had never produced any profits.

ing out of his medical practice more than $400,000, and he continued to live in the marital home; and

that the parties from the time of the separation until the present have engaged in a significant amount of litigation (obviously requiring representation by counsel), including an action by the husband to recover damages from the wife for allegedly refusing to work at their boutique shop; the resolution in court of disputes arising over discovery; and an action by the wife for alimony pendente lite pursuant to D.C.Code § 16–911 (1997), presumably in connection with her action for divorce after one year's separation. *See* D.C.Code § 16–904 (1997).[2]

The able trial judge concluded in his Judgment, denying any spousal support for appellant and directing each party to pay its own counsel fees, that appellant wife "will not become a public charge; she is an educated woman and has established herself in the fashion world." The court further stated: "[The wife] appears to be in good health. [She] possesses employable qualities which would enable her in seeking gainful employment. In addition, she has business acumen as well as being a well-respected seamstress."

■ These findings and conclusions are without support in the evidence. There is no evidence to show that appellant wife had "established herself in the fashion world." Rather, the record reflects that the parties had operated a boutique shop that turned no profits and nothing demonstrated that she had "business acumen." Indeed, the theme of appellee husband over the years was that she had absolutely no business sense. While there was evidence that she was "a well-respected seamstress," there was also evidence that contact with fabrics exacerbated her allergies.[3]

In addition, the record reflects that appellant wife had taken a loan in the amount of $7,500 upon which to subsist. Appellant wife showed that she had taken out this loan to enable herself to pay $750 per month for a room in a private home. In the meantime, appellee husband not only was living in the marital home but was also receiving income from his medical practice as well as several hundred thousand dollars from his pension trust fund.

■ Although the trial court in its denial of any support under § 16–916(a) to appellant wife concluded that, given her age and relatively good health, she "is in a position to secure employment" and "will not become a public charge," we do not understand that in order to obtain spousal support under the statute as a "needy spouse," one must first receive public assistance. The record reflects that appellant wife was forced to borrow $7,500 in order to live separate and apart from the husband. Certainly, a person close to 50 years of age who is generally in good health should be expected both to seek and also obtain employment, but at the time this action for spousal support was taking place in late 1997 and early 1998, appellant wife was extricating herself from an abusive marriage and a failed business in partnership with her estranged spouse. Appellant wife assuredly possessed "employable qualities" but nevertheless required "reasonable sums periodically" for support.

■ Also, appellant wife was engaged in vigorous litigation, thereby necessarily incurring substantial counsel fees. The ap-

---

2. The record reveals that appellant wife has sought pendente lite alimony from appellee husband, but the trial court denied such alimony for the stated reason that it was barred by *res judicata* from considering and awarding pendente lite alimony because the court had earlier denied spousal support under § 16–916(a).

3. Fiction is filled with heroines who inspire the reader with their sewing skills, but in the "real world" the seamstress, no matter how talented, has a limited market for such skills.

plicable statute specifically recognizes that "suit money, including counsel fees, pendente lite" is necessary to enable the spouse to conduct her case. D.C.Code § 16–916(a). Here, the wife was certainly entitled to suit money, including counsel fees, in order to maintain her suit for spousal support against such a vigorous legal defense as her physician spouse maintained.

In our view, the trial court's determinations upon this record that appellant wife was not entitled to spousal support under the factors set forth in *Tibbs* and to "suit money" under the applicable statute were clearly erroneous.

We turn now to a further finding by the court:

> During [appellant wife's] testimony, she recounted two incidents of physical abuse and a pattern of domination by the [appellee husband]. [Appellant wife] stated in her testimony that there has not been any abuse in the marriage since an incident in 1992 where she left the marriage for 5½ weeks. The [appellant wife] later returned to the marital residence. Accordingly, *the Court does not find that [appellant wife] had cause to leave the marital residence*. [Emphasis added.][4]

Appellee husband cites us to *Lee v. Lee*, 267 A.2d 824, 826 (D.C.1970), which held that "when the wife [leaves] her husband and marital abode without just cause, such desertion [is] a bar to her claim for separate maintenance and support." *Lee's* "just cause" requirement served to encourage families to remain together to resolve their differences rather than separating. *Id.* Indeed, at one time, a spouse may have had to endure acts of physical violence or

mental cruelty before having just cause to leave the marital abode. *See Waltenberg v. Waltenberg*, 54 App.D.C. 383, 384, 298 F. 842, 843 (1924).[5] However, the level of conduct necessary to justify a spouse's departure from the marital residence has necessarily changed by reason of the adoption in this jurisdiction of "no-fault" divorces. D.C.Code § 16–904.

■ At the trial in the instant case, appellant wife recounted in her testimony a mosaic of conduct and words by appellee husband which were tantamount to emotional abuse, cruelty and intimidation. Specifically, appellee husband dominated appellant wife's daily activity by demanding to know of her whereabouts at all times, requiring her to get his permission for attending all social events, preventing her from attending any events of which he disapproved, and threatening physical abuse or separation when she opposed any of these conditions he had imposed.

She further testified that appellee husband continually humiliated and degraded her by criticizing her in front of others, abruptly terminating visits with her friends by declaring that she needed to tend to his needs first, interfering in her dealings with customers at their boutique shop, and intimidating her by standing unusually close to her, speaking loudly and wagging his finger in her face. Appellee husband also endeavored to isolate appellant wife from her family by limiting appellant's telephone conversations with her sister and mother, and by restricting the duration of appellant's out-of-town visits with her mother.

On one occasion, in 1992, appellant called the police to their home because of

---

4. The record reflects "two incidents of physical abuse." In 1977, appellee husband struck appellant wife in the face as she was talking on the telephone while taking a bath. This blow caused further injury to her head as it hit the tiled wall. Then, in "the late '80s," appellee husband put his thumb under appellant wife's arm, pinning her against a door jamb and lifting her off the ground.

5. In setting the level of conduct necessary to constitute "just cause," courts often required acts commensurate with the fault-based divorce regime. *See Roberson v. Roberson*, 297 A.2d 769, 770 (D.C.1972).

her fear of appellee's intense agitation after a disagreement. The police responded and appellee husband sought to turn them away, but they refused to leave until they were able to speak with appellant wife and assure themselves that she was not in a dangerous situation. This episode was severe enough to compel appellant wife to vacate the marital home for five and one-half weeks.

The record shows here not only mistreatment and ill-use of appellant wife by appellee husband over the years of their marriage, but also that the parties have grown apart and that appellant wife left the marital residence after the marriage itself had become lifeless for her. We cannot conclude, under all these circumstances, that her separation from her husband was without justification. Hence, the applicable statute warrants a determination by the trial court that she should have separate maintenance in accordance with the *Tibbs* factors set forth above.

Accordingly, we reverse the trial court's judgment insofar as (1) it denied "spousal support and maintenance" for appellant wife, (2) declared that appellee husband "does not have to pay any amount for spousal support and maintenance," and (3) determined that each party to this litigation "shall each be responsible for his or her own attorney's fees," but we affirm the remaining portions of the trial court's judgment. We remand the case to the trial court for further proceedings not inconsistent with this opinion so that the parties can conclude their litigation upon a more level "playing field." The wife shall receive appropriate spousal support retroactively, until such time as the court may determine her claims for permanent alimony and alimony pendente lite.

*So ordered.*

FARRELL, Associate Judge, concurring.

I agree with the court that the "primary factors" set forth in *Tibbs* favor an award of separate maintenance here. I also agree that "the level of conduct necessary to justify a spouse's departure from the marital residence has necessarily changed by reason of the adoption in this jurisdiction of 'no fault' divorces." *Ante* at 670. *See Bernard v. Bernard,* 730 A.2d 663, 666 & n.9 (D.C. 1999). Finally, I agree that the evidence is unmistakable that the Atkinsons had "grown apart"—irretrievably—"and that appellant wife left the marital residence after the marriage itself had become lifeless for her." *Ante* at 671.

That is enough to require reversal and remand for determination of an award of separate maintenance. I do not join the court's conclusion that Dr. Atkinson engaged in "a mosaic of conduct [toward Mrs. Atkinson] . . . tantamount to emotional abuse, cruelty and intimidation" or that he "threaten[ed] physical abuse" or "continually humiliated and degraded her . . . in front of others." *Ante* at 670. These factual findings—and essentially they are that—run largely contrary to the facts as found by the trial judge sitting as trier of fact. The judge heard Mrs. Atkinson's testimony and rejected these characterizations of the husband's behavior, partly no doubt because of the uncorroborated nature of many of her assertions. It is not disputed that there had been episodes of physical violence during the long course of the marriage but, as the judge found, none during the most recent five year period when the couple continued to live together.[1]

---

1. Dr. Atkinson's brief sets forth the evidence of purported violence, threats, and harassment in the light most favorable to the judge's findings, as follows:

At trial, Mr. Atkinson testified to an incident in April 1997 at the TATA Boutique in which she claimed that Dr. Atkinson placed his hands around a pair of scissors in such a way as to upset her and make her feel threatened. However, two individuals who were present at the boutique on this occasion testified that they heard no raised

Describing Dr. Atkinson's behavior as this court does is both unfair to him—in light of the trial court's evaluation of the conduct—and unnecessary in a legal system in which separate maintenance has become essentially a preliminary stage of proceedings culminating in divorce, support, and property settlement all nearly free of considerations of fault. See Br. for Amicus at 6–7 (noting that "[e]ven if the suit for separate maintenance proceeds separately from the divorce proceeding, it is likely that the separate maintenance proceeding will be strategically tied to the divorce by attorneys and clients on both sides"). We should not feel obliged to shoehorn the evidence into a framework of "physical abuse" and "mental cruelty" superannuated by the change in our statutory law.

voices, screaming or crying, that Ms. Atkinson was upset because Dr. Atkinson did not allow her to take items out of the store, that Ms. Atkinson made no mention of anything unusual having taken place upstairs and gave no indication that she felt threatened, and that Ms. Atkinson left the store with a smile and seemed to be in no hurry to leave.

Ms. Atkinson is a long-time resident of the District of Columbia and has family and friends in the D.C. area. However, there is no evidence in the record that she ever related details of Dr. Atkinson's behavior towards her to family or friends and none of her testimony in this regard was corroborated by any third party witnesses. In fact, witnesses presented by Dr. Atkinson at trial testified to the contrary. Ms. Ellen McNeal, who has known the Atkinsons for many years and who has worked at the TATA Boutique since the summer of 1996 described the couple as "beautiful" and their interaction with each other as "pleasantness." Ms. McNeal testified that Ms. Atkinson never verbalized any fear of Dr. Atkinson or complained that he was harassing her, that she never saw bruises or scars on Ms. Atkinson, and that she never saw Dr. Atkinson raise his fist to Ms. Atkinson, come up to her, hover over her or exhibit any behavior towards his wife which Ms. McNeal would characterize as humiliating.

Mr. Blaine White, who has known the Atkinsons well and seen them regularly since he started dating one of Dr. Atkinson's daughters in 1989, testified that he never saw bruises, scars or marks on Ms. Atkinson and never heard her complain about humiliation or harassment from her husband. He further testified that he knows members of both parties' families and has socialized with the family on holiday occasions as well as on other regular occasions. He stated that he has never seen or known of situations where Dr. Atkinson prevented Ms. Atkinson from seeing her family or friends and has never received any indication from people whom he had met through Ms. Atkinson that they ever felt that they were not welcome or not wanted at the Atkinson home.